## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. |
| VALORIE W. DAVENPORT, | § | 03-38089-11 |
| DEBTOR | § | |
| | | ADV. NO. |
| RON S. RAINEY, | § | |
| | | 04-3618 |
| PLAINTIFF | § | |
| VS. | § | |
| VALORIE W. DAVENPORT, | § | |
| DEFENDANT | § | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

This six-day adversary proceeding involves a dispute between two trial lawyers over contingent fees. The plaintiff, Ron S. Rainey (Rainey), was an associate at the Davenport Law Firm, a small civil litigation plaintiff's boutique solely owned by Valorie W. Davenport, the debtor in this Chapter 7 case (the Debtor). The Debtor lured Rainey away from another firm by offering him a higher salary and assigning to him a percentage of the contingent fees to which the Davenport Law Firm was entitled in certain litigation. Both the testimony at trial and various documents admitted into the record refer to this litigation as "the Brio/DOP Litigation." At trial, the Debtor described this litigation as follows:

1

The Brio DOP site is an old—basically it was portrayed as a site down in the Friendswood area that was supposed to, or allegedly reprocessed byproducts from various chemical plants, but really what it was, it was a toxic dumpsite. It had a lot of unlined pits and a lot of chemical producers took their waste down there under the guise of some of them selling them for reprocessing, but really what it was, was a way of getting rid of their toxic waste and so it was the surrounding land was then developed for first-time home buyers and a elementary school was put in and the toxic waste seeped out into the community thereby causing injury to the—a lot of the children and the adults in the that area, causing a lot of litigation. [Transcript D1, p. 23, line 16 through p. 24, line 3].[1]

The defendants in this litigation were large corporations with deep pockets, including Monsanto Company, Atlantic Richfield Company, Chevron Chemical Company, Amoco Chemical Company, and Union Carbide Corporation. [Transcript, D1, p. 25, line 9 through p. 26, line 5]. Indeed, the "Brio/DOP" moniker stands for Brio Refining, Inc./Dixie Oil Producers. [Transcript D6, p. 244, lines 11 - 12]. In 1984, the Federal Government determined that hazardous substances present in the area endangered the residents and designated it as the "Brio Superfund Site". [Transcript D1, p. 24, line 20,  through p. 25, line 3].

The Davenport Law Firm was one of several firms representing the plaintiffs in the Brio/DOP Litigation.  As this litigation grew, the Debtor decided to recruit another attorney to join the Davenport Law Firm.  That attorney was Rainey.  [Transcript D1, p. 23, lines 4 - 9].

After Rainey moved to the Davenport Law Firm, the Debtor paid him the entire promised higher salary, but she failed to remit to him his full percentage of the contingent fees.  When these fees were paid to the Debtor's firm, the Debtor, rather than allocating them proportionately to

---

[1]Throughout this Memorandum Opinion, there are citations to the transcript of the trial. "D1" means that the transcript is from the first day of the trial, "D2" refers to the transcript from the second day of the trial, and this method of abbreviation is used for all six days of the trial.  References are also made to various exhibits introduced by the Debtor and Rainey at trial.

2

Rainey, spent some of the funds to which Rainey was entitled.  Thereafter, Rainey sued the Debtor in state court.  Rainey and the Debtor achieved a settlement in mediation, and the suit was dismissed.  However, the Debtor then defaulted under the terms of the mediated settlement agreement, prompting Rainey to file a second lawsuit.  In this second suit, the Court granted summary judgment for Rainey.  Thereafter, the Debtor filed a voluntary Chapter 11 petition, and Rainey filed a proof of claim based on the mediated settlement agreement and judgment from the second suit.  Once the Debtor's case was converted to a Chapter 7 case, Rainey initiated this adversary proceeding by filing a complaint against the Debtor to determine dischargeability under 11 U.S.C. §523(a)(4) or, alternatively, 11 U.S.C. §523(a)(6).

Rainey seeks to prevent the discharge of his claim against the Debtor for spending a portion of the contingent fees that she owed to him.  Rainey negotiated the amount of the claim at the mediation and subsequently reduced the claim to a judgment in the second suit.  [Transcript D2, p. 213, lines 8 - 17].  Rainey bases his complaint against the Debtor on any one of the following four grounds:  (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; (3) larceny; or (4) willful and malicious injury by the Debtor to Rainey.  This Court does not believe  that the Debtor was in a fiduciary relationship with Rainey, nor does this Court believe that the Debtor committed larceny; therefore, Rainey's complaint fails with respect to these two grounds.  Conversely, this Court holds that the Debtor embezzled the funds belonging to Rainey.  Accordingly, Rainey's claim is nondischargeable.  Alternatively, and in addition to the Court's holding on embezzlement, this Court holds that the Debtor's spending of the monies belonging to Rainey constitutes willful and malicious injury by the Debtor to Rainey.  The purpose of this Memorandum Opinion is to discuss how this Court has arrived at these holdings.

## II.   FINDINGS OF FACT[2]

1.    The Debtor graduated from the University of Houston Law Center and has been a licensed

attorney in the State of Texas since 1984. [Transcript D1, p. 20, line 21 through p. 21, line

1; Transcript D2, p. 139, lines 4 - 11].

2.    After graduating from law school, the Debtor served as a briefing attorney for the Texas

Court of Appeals, First District. Thereafter, for a few years, she worked for certain plaintiff's

firms in Houston. In 1989, the Debtor founded her own firm with a civil litigation practice

(the Davenport Law Firm or the Debtor's law firm). [Transcript D3, p. 140, lines 11 - 14].

The Debtor is the sole principal of the Davenport Law Firm. [Transcript D1, p. 21, line 17

through  p. 22, line 10; D6, p. 262, lines 6 - 18].

3.    Soon after the Debtor started her own law firm, she was appointed as the attorney *ad litem*

for approximately 200 children in the Brio/DOP Litigation. This appointment eventually led

to her firm accepting representation of various plaintiffs in the Brio/DOP Litigation.

[Transcript D3, p. 141, line 21 through p. 144, line 9].

4.    Rainey has an undergraduate degree in accounting as well as a masters in taxation from the

University of Texas-Arlington. He worked at an accounting firm for a few years before

obtaining a law degree from the University of Houston Law Center in 1988; however, he

does not hold a CPA. After graduating from law school, he began work as an associate at

the law firm of Haynes and Fullenwider; and when that firm disbanded, he worked for the

Law Offices of Richard Haynes for approximately seven years. Thereafter, he became an

associate attorney at the Davenport Law Firm. [Transcript D1, p. 247, line 3 through p. 248,

---

[2]This Court makes additional findings of fact in Sections III and IV of this Memorandum Opinion.

line 1; Transcript D2, p. 236, lines 2 - 3; Rainey's Exhibit #42].

5.     The Debtor first met Rainey in 1992 or 1993 when he was working for the Law Offices of Richard Haynes. [Transcript D1, p. 22, line 23 through p. 23, line 1].

6.     When the Debtor first met Rainey, the Debtor believed that Rainey could help her firm because he "was a good administrative attorney and good second chair for Mr. Haynes and I thought he would be good in the practice from that perspective." [Transcript D1, p. 23, lines 4 - 9; see also Debtor's Exhibit #64, p. 2, lines 2 - 5].

7.     In order to persuade Rainey to leave the Law Offices of Richard Haynes and move to her firm, the Debtor orally promised Rainey:   (a) a salary increase from $50,000.00 to $90,000.00; and (b) an initial assignment of  10% of the fees which the Davenport Firm earned from all Brio/DOP Litigation, with the percentage to increase over a period of time. [Transcript D1, p. 27 , line 22 through p. 28, line 9; Transcript D1, p. 249, line 16 through p. 250, line 17].

8.     Neither party reduced these promises to writing at the time the Debtor made them. [Transcript D1, p. 31, lines 19 - 22; Transcript D1, p. 251, lines 7 - 10].  However, Rainey in reliance on these promises,  resigned from the Law Offices of Richard Haynes and took an associate position at the Davenport Law Firm in October of 1993.  [Transcript D1, p. 250, lines 18 - 20].  Rainey was an associate at the Debtor's law firm during his entire tenure there.  [Transcript D2, p. 271, lines 9 - 11; Transcript D4, p. 19, lines 17 - 19].  The Debtor considered him an employee at all times.  [Transcript D6, p. 262, lines 18 - 20].

9.     Once Rainey's employment started at the Davenport Law Firm, he worked on various cases, including the Brio/DOP Litigation.  The Debtor never removed Rainey from working on the

Brio/DOP Litigation, which was the biggest case in her firm.  [Transcript D1, p. 251, pages 2 - 6; p. 251, line 22 through p. 252, line 2; Transcript D4, p. 19, lines 17 - 19].

10.     On June 15, 1995, the Debtor and John M. O'Quinn, on behalf of his law firm (O'Quinn), entered into an agreement whereby, among other terms, O'Quinn assumed full responsibility for certain claims comprising a portion of the Brio/DOP Litigation; specifically, the Aguilar, Melendez, and Le claims (hereinafter referred to as the O'Quinn/Brio Litigation, which involved a total representation of approximately 26 plaintiffs).  According to this agreement, O'Quinn and the Debtor's law firm would share the net attorneys' fees received from these cases on a 50%/50% basis.    Further, O'Quinn was to have no involvement in or responsibility for any other case comprising the Brio/DOP Litigation, including but not limited to the so-called Allen case.  [Rainey's Exhibit #3; Debtor's Exhibit #25].

11.     On July 12, 1995, the Debtor and John E. Williams, on behalf of his law firm, Williams, Bailey and Westner (Williams), entered in an agreement whereby, among other terms, except for the O'Quinn/Brio Litigation, Williams would partner with the Davenport Law Firm to prosecute all cases, existing or acquired in the future, that related to the Brio/DOP site (hereinafter referred to as the Williams/ Brio Litigation, which involved a total representation of approximately 1,200 plaintiffs).  According to this agreement, Williams and the Davenport Law Firm would share the net attorneys' fees received from these cases on a 50%/50% basis and, in the interim, Williams would advance the Davenport Law Firm $65,000 each month to cover the expenses of the Debtor's  firm's expenses.  [Rainey's Exhibit #89].

6

12.  On March 6, 1996, the agreement between the Debtor and Williams was modified so that Williams would no longer be remitting to the Debtor's firm the monthly sum of $65,000.00. [Debtor's Exhibits #27 and 28; Rainey's Exhibit #63].

13.  In April of 1996, the Davenport Law Firm filed four lawsuits—two in the United States District Court for the Southern District of Texas, Galveston Division; and two in Harris County District Court (hereinafter referred to as the Davenport/Brio Litigation)—which comprised part of the Brio/DOP Litigation. [Transcript D1, p. 179, line 21 through p. 186, line 23; Rainey's Exhibits #6 and 7].

14.  On July 29, 1996, the Debtor sent a letter to an employee of Williams to request that office space be made available for certain employees of the Davenport Law Firm, including Rainey. In this letter, the Debtor represented that Rainey "has a percentage partnership interest in the Brio recovery."  [Transcript D1, p. 137, line 18 through p. 137, line 13; Rainey's Exhibit #2].

15.  On November 1, 1996, the Debtor received $162,514.03 from O'Quinn.  This amount represented a payment of a small portion of the fees earned by the Davenport Law Firm from the O'Quinn/Brio Litigation.  Subsequently, O'Quinn provided to the Debtor a chart entitled "Settlement Reconciliation," which reflected that the total amount of fees due to the Debtor's firm from the settlement of the O'Quinn/Brio Litigation was $1,165,749.39.  [Rainey's Exhibit #4; Debtor's Exhibit #26].  This chart also reflected that O'Quinn deducted certain amounts from this figure, including $331,780.36.  The amount of $331,780.36 was deducted to pay O'Quinn principal and interest on a loan that O'Quinn had extended to the Debtor for the purchase of her house on Sunset Blvd. in Houston, Texas. [Rainey's Exhibits #4, 5 and

64; Debtor's Exhibit #26; Transcript D1, p. 145, lines 8 - 21].[3]  Rainey does not know why O'Quinn made all of the deductions that he did, as the discussions regarding these deductions occurred between O'Quinn and the Debtor outside of Rainey's presence.  [Transcript D2, p. 236, line 12 through p. 239, line 4].  The Debtor has never provided Rainey with a list of the expenses attributable to the O'Quinn/Brio Litigation.  [Transcript D2, p. 293, lines 4 - 7].

16.     Because Rainey worked on the Brio/DOP Litigation, he had knowledge about the status of the various cases.  In 1996, he knew that the O'Quinn/Brio Litigation had settled, and he was expecting to receive his promised percentage of the fees paid to the Davenport Law Firm. At this time, he believed his percentage was 15%.  The Davenport Law Firm's fees from the O'Quinn/Brio Litigation totaled $1,165,749.39, and therefore Rainey was expecting to receive approximately $170,000.00.  Yet, the Debtor paid him nothing.  [Transcript D1, p. 252, line 3 through p. 253, line 24].

17.     Upset about not receiving his assigned percentage share of the fee from the O'Quinn/Brio Litigation, Rainey met with the Debtor to express his displeasure and obtain an explanation. The Debtor told him that O'Quinn was not going to immediately pay her the entire fee owed to the Davenport Law Firm, but only a portion of the fee, and that she needed all the funds that O'Quinn was going to be paying her at the moment.  [Transcript D1, p. 253, line 25 through p. 254, line 8].

18.     At or about the time that Rainey expressed his disenchantment to the Debtor about the fact that he would not be receiving any portion of the fee from the O'Quinn/Brio Litigation, the Debtor wrote him a letter on August 14, 1996.  This letter requested Rainey to set forth his

_____

[3]It is unclear whether the loan was from the O'Quinn Law Firm or Mr. O'Quinn, in his individual capacity.

8

understanding of the terms of his employment when he came to work at the Davenport Law

Firm in October of 1993.  In this letter, the Debtor did not set forth what she believed to be

the terms of Rainey's employment.  [Transcript D1, page 255, line 24 through p. 256, line

19; Rainey's Exhibit #66; Debtor's Exhibit #31].

19.     On September 20, 1996, Rainey responded to the Debtor's August 14, 1996 letter.   His

response was very specific about the terms of the oral agreement.  He wrote as follows:

> My scope and responsibility for the work/management of the Brio files was
> not specifically discussed.  However it was specifically discussed that O'Quinn and
> his office would play a major role in these areas.

> As it relates to bonuses, I expect no Brio bonus in that I have an interest in the
> outcome of the litigation.  In regard to non-Brio litigation, my bonus would be within
> your sole discretion and, as you put it, out of the goodness of your heart.

> Brio was tied directly to our agreement and my decision to come to your firm.
> As it relates to the Brio litigation, we specifically discussed and I was to receive a
> percentage interest in the outcome of **all** Brio cases, those presently retained and/or
> filed and all cases later acquired.[1]  The percentage interest varied depending upon
> time within which the cases were resolved and/or tried.  I was to receive, up front, a
> 10% interest in the outcome of all Brio litigation.[2]  I was to receive an additional 5%
> interest for each year in excess of two years.  Thus, at the end of three years
> employment I would have a 15% interest, at the end of 4 years of employment, I
> would have a 20% interest etc.  This percentage was to be allocated over time.  For
> example if the litigation took 3 and ½ years I would have a 17½% interest.  The
> interest was a percentage of the outcome less case related expenses.  This interest was
> to be a present vested assignment of the outcome of the litigation with the passage
> of time and services and thus succeed to my wife and/or kids should anything happen
> to me.  There was no dollar floor or ceiling on the interest other than that which
> would be set by the percentage of the outcome less case related expenses.  The
> interest was to be paid on a case by case basis.  I do not remember discussing draws
> as they relate to my interest in the Brio litigation.

> Our agreement was outcome less case related expenses.  This did not include
> such items such as salaries, rent, or any overhead.  It was case expenses as they relate
> to that specific case.  At that time the only expenses that I foresaw that might be
> deductible from the fees generated were those that the court required in relation to
> any minors that we represented, for all other case related expenses would be

reimbursed by the clients. I did not foresee this definition of "after expenses" to change. [Transcript D1, p. 255, line 24 through p. 256, line 19; Rainey's Exhibit #67; Debtor's Exhibit #33].

[1] We specifically discussed the filing of new suits including but not limited to the Weber plaintiffs.

[2] Although it was not discussed I did not and do not expect an interest in the ad litem litigation.

20.     As a result of the Debtor failing to pay Rainey any of his percentage share from the fee earned by the Debtor's firm in the O'Quinn/Brio Litigation, and as a result of the exchange of letters between the Debtor and Rainey referred to above, the Debtor and Rainey signed the only written agreement describing the specific terms and conditions under which Rainey would receive a percentage of any contingent fee in the Brio/DOP Litigation to which the Davenport Law firm was entitled. This written agreement (the Agreement), which the Debtor and Rainey executed at the Davenport Law Firm on November 26, 1996, [Transcript D2, p. 284, lines 3 - 9], reads as follows:

> This document shall hereby memorialize a prior assignment to Ron Rainey, as a condition of Ron Rainey accepting employment with the Law Offices of Valorie W. Davenport in October of 1993, of an amount equal to 15% (fifteen percent), less expenses directly related to the Brio/DOP litigation, of the interest of The Law Offices of Valorie W. Davenport in the outcome of any and all Brio/DOP litigation of which the Law Office of Valorie W. Davenport had an interest in as of October 3, 1993 and/or acquired an interest in prior to the date below. Ron Rainey is also hereby assigned the same percentage interest in any and all Brio/DOP litigation of which The Law Offices of Valorie W. Davenport may acquire subsequent to the date below as long as Ron Rainey works on and is associated with this subsequently acquired litigation. This assignment includes the Aguilar, Le and Melendez lawsuits previously settled, but does not include any prior ad litem disputes with the 151[st] court. [Transcript D1, p. 25, line 8 through p. 37, line 9, Rainey's Exhibit #1; Debtor's Exhibit #34].

21.     Rainey relied on the Agreement, and on his future receipt of funds generated as each case in the Brio/DOP Litigation settled, in order to continue working at the Davenport Law

Firm; and if the Debtor had refused to execute the Agreement, Rainey would have resigned from her firm. [Transcript D1, p. 252, line 3 through p. 255, line 23]. The Debtor has never revoked the Agreement in writing. [Transcript D1, p. 39, lines 22 - 24].

22.   After the Debtor and Rainey signed the Agreement, Rainey continued to work on the Brio/DOP Litigation. [Transcript D1, p. 257, pages 24 - 25].

23.   On May 23, 1997, the attorney for some of the defendants in the Williams/Brio Litigation wrote a letter to Williams discussing amounts to be paid to certain plaintiffs in this litigation as part of a settlement. [Rainey's Exhibit #9].

24.   On June 17, 1997, the attorney for Monsanto Company, one of the defendants in the Williams/Brio Litigation, wrote to Williams, the Debtor, and the other attorney representing the plaintiffs, setting forth that Monsanto would pay $10 million to settle all claims against the company. [Rainey's Exhibit #10].

25.   In September 1997, as a result of the settlement of the Williams/Brio Litigation, the settlement proceeds were paid to Williams. [Transcript D2, p. 244, lines 13 - 23; p. 276, lines 6 - 23]. At approximately that same time, Williams distributed a disbursement sheet showing that the Davenport Law Firm's share of the fee was $4,577,929.04. [Transcript D1, p. 261, line 18 through p. 265, line 17; Rainey's Exhibit #11].

26.   On September 12, 1997, the Debtor received a $500,000.00 check from Williams. This money was due to the Davenport Law Firm as part of its contingency fee related to the Williams/Brio Litigation. The Debtor did not deposit the check into her firm's trust account, an IOLTA account, or in an escrow account. Rather, she deposited this check into her firm's operating account. [Transcript D1, p. 71, line 5 through p. 72, line 12; p. 176, lines 13 - 21;

Rainey's Exhibits #13 and #15, p. V00027].  From the $500,000.00, the Debtor then paid Rainey the sum of $50,000.00.  [Debtor's Exhibit #38; Transcript D2, p. 272, lines 18 - 24].

27.   On September 15, 1997, Rainey  resigned from the Davenport Law Firm.  [Transcript D1, p. 26, lines 14 - 16; Rainey's Exhibit #56].  Once he resigned, he ceased working on the Brio/DOP Litigation.  [Transcript D2, p. 271, lines 19 - 21].

28.   On September 22, 1997, the Debtor paid Rainey another $50,000.00.  [Debtor's Exhibit #37; Debtor's Exhibit #37, Transcript D2, p. 272, lines 18 - 24].

29.   On September 23, 1997, the Debtor received a $2,245,447.34 check from Williams.  Once again, this money was due to the Davenport Law Firm as part of its contingent fee related to the Williams/Brio Litigation. The Debtor did not deposit this check into a trust account because, as she testified: "I don't think I ever considered putting it [the check] in my trust account.  It was just my fees." Again, the Debtor deposited the funds into her firm's operating account.  [Transcript D1, p. 73, line 3 through p. 79, line 1; p. 176, lines 13 - 21; Rainey's Exhibit #14].

30.   Although the disbursement sheet from Williams showed that the Davenport Law Firm's share of the fee from the Williams Litigation was $4,577,929.09, Williams made deductions such that the actual amount of money remitted to the Debtor's firm was $2,745,447.39. Rainey does not know why Williams made all of the deductions that he did, as the discussions regarding these deductions occurred between Williams and the Debtor outside of Rainey's presence.  [Transcript D2, p. 236, line 12 through p. 239, line 4].  The Debtor has never provided to Rainey a list of the expenses attributable to the Williams/Brio Litigation.  [Transcript D2, p. 243, lines 4 - 7].

Case 04-03618   Document 105   Filed in TXSB on 02/07/06   Page 13 of 36


31.     On September 24, 1997, the Debtor paid Rainey the amount of $300,000.00 [Transcript D1,

p 76, line 22 through p. 77, line 12; Rainey's Exhibit #15; Debtor's Exhibit #39], and told

him that she would meet with him in two weeks to resolve the issue regarding how much she

still owed him pursuant to the Agreement.  [Debtor's Exhibit #43].

32.     On October 9, 1997, Rainey and the Debtor had a face-to-face meeting to discuss what

amount the Debtor still owed to Rainey.  The Debtor informed Rainey that she still did not

have all of the expenses available in order to determine what was owed to Rainey.  She

promised Rainey that she would meet with him and resolve the issue before she departed for

her vacation in Hawaii on October 15, 1997.  [Debtor's Exhibit #43].

33.     On October 14, 1997, Rainey spoke with Gloria, an employee at the Davenport Law Firm,

who told him that the Debtor would not be able to meet with him before taking her two week

trip to Hawaii.  [Debtor's Exhibit #43].

34.     On October 14, 1997, after he spoke with Gloria, Rainey wrote a letter to the Debtor stating,

in part, the following:

> On September 24, 1997, you promised me that we would meet within two
> weeks and resolve the fees due and owing me as a result of the Brio settlements.  On
> Thursday, October 9, 1997, I met with you and at that time you again explained you
> still did not have all of the expenses available but promised we would meet and
> resolve the matter before you left for Hawaii on the 15th of October.  I just spoke to
> Gloria and she has now informed me that you will not be able to meet before your
> two-week trip to Hawaii.
> Valorie, this is not fair and in keeping with your word. . .

At trial, the Debtor conceded that she did not meet with Rainey to resolve the fee dispute

within the above-referenced two weeks.  [Transcript D4, p. 29, line 7 through p. 30, line 5;

Transcript D4, p. 37, lines 5 - 9].  In the October 14 letter, Rainey provided the Debtor with

his estimate of what he believed she owed him.  His estimate was $325,000.00.  [Debtor's Exhibit #43; Rainey's Exhibit #49].

35.   On October 15, 1997, the Debtor departed for a two week vacation in Hawaii.  [Transcript D1, p. 26, lines 9 - 16; Debtor's Exhibit #43].

36.   When Rainey left the Davenport Law Firm, he told the Debtor that he was not going to work any further on the Davenport/Brio Litigation.  [Transcript D1, p. 187, lines 13 - 17].

37.   After Rainey left, he went to work at the law firm of Fox, Rainey and Buttram.  The Debtor attempted to convince this firm to take over the Davenport/Brio Litigation, but this firm declined to do so.  [Transcript D1, p. 189, line 13 through p. 190, line 24].  The Rice firm took over the Davenport/Brio Litigation, and eventually, judgment was rendered against the plaintiffs in the cases comprising this litigation.  The Davenport Law Firm received no fee for the Davenport/Brio Litigation, and therefore the Debtor and Rainey have no fee dispute relating to this particular litigation.  [Transcript D1, p. 191, line 6 through p. 193, line 2].

38.   Throughout 1997, the Debtor made monthly payments of $2,835.52 to Greenspoint Mortgage, the holder of a lien on the Debtor's house, out of her firm's operating account.  She also used her firm's operating account to pay for her two automobiles.  [Transcript D1, p. 95, line 6 through p. 98, line 4; Rainey's Exhibit #21].  Additionally, despite testifying that she did not expect Rainey to be charged for the rent that her firm pays, she conceded that "Well I did use–when we got that fee in, I did use some of these monies to pay expenses on our overall office space."  [Transcript D3, p. 165, line 20 through p. 166, line 5; p. 187, line 24 through p. 188, line 4].  Further, the Debtor testified that when her firm received the fee from the Williams/Brio Litigation in the fall of 1997, she used $250,000.00 to pay off a firm

loan, the proceeds of which she had used to pay the firm's operating expenses. [Transcript

D3, p. 178, line 25 through p. 179, line 25; Rainey's Exhibit #21, Bates Stamp #V00156].

39.    The monthly expenses of the Debtor's law firm during the time period that the firm was

prosecuting the Brio/DOP Litigation was between $85,000.00 — $95,000.00. [Transcript

D4, p. 30, lines 12 - 15].    Moreover, during this same period, the Debtor had personal

expenses between $27,000.00 — $30,000.00 per month, including a monthly house payment

of approximately $5,000.00. [Transcript D4, p. 30, lines 19 - 25]. The Debtor has admitted

using the fees from the Brio/DOP Litigation to pay personal expenses [Transcript D4, p. 36,

lines 7 - 8]; and she has made a judicial admission that she received these fees knowing that

Rainey had a legal interest in them. [Transcript D1, p. 16, lines 23 - 25].

40.    On January 12, 1998, the Debtor wrote a letter to Rainey discussing, among other issues, her

thoughts about the sums due to Rainey under the Agreement.  The Debtor conceded that:

   "The Brio cases took nearly four years to settle and eventually brought in far less
   money than either of us expected.  During what turned out to be a long four years, as
   more of the firm resources had to be directed toward Brio, and you as well as much
   of our staff – at least in the beginning – had to move to Williams and Bailey, we
   found ourselves in a position where Brio was draining us and we weren't getting any
   new infusion of capital because we could not aggressively work and turn our existing
   cases.  In order to pay overhead, I had to personally turn over $1,500,000.00 in order
   to keep the firm alive."  [Rainey's Exhibit #84].

        This information is shared with you in order to reemphasize that Brio did not
   make the profit either of us expected.  I also hope it will show you that despite what,
   if anything else, you receive now, you have made a sizable and by most people's
   standards "great" profit on top of a healthy salary.  On the other hand, I have and will
   continue to absorb a stagging (sp) loss.  In light of these facts my feeling again is that
   we are more than right with each other.  [Rainey's Exhibit #84].

41.    On January 16, 1998, Rainey responded to the Debtor's letter of January 12, 1998.  In this

letter, Rainey maintained that he was still owed $325,000.00—the same figure set forth in

15

his October 14, 1997, letter—and he emphasized to the Debtor that the poorer-than-expected outcome of the Brio/DOP Litigation was not a basis for the Debtor to change the terms of the Agreement.  Specifically, Rainey wrote:

> I agree that Brio did not settle for what we had expected.  However, I do not agree that the fact that Brio did not settle for what you expected provides a means by which you can modify our agreement. If you will remember, I forewent other opportunities when I accepted employment with your firm. I did so based on the Brio litigation. Two years later we sat down and memorialized our agreement relating to Brio. It is apparent that you are now unhappy with that agreement and that you believe the terms are unclear. It seems the major issue in your mind is what are "expenses directly related to the Brio/DOP litigation"?  We discussed this matter prior to the signing of the agreement and if you will refer to my letter of September 20, 1996, you will see that my percentage would not be reduced for expenses such as salaries, rent, or any overhead. In fact, it was originally worded as "related expenses" and then changed to "expenses *directly* related to the Brio/DOP litigation." I have never agreed to fund the operation of your firm. [Transcript D2, p. 204, line 8 through 205, line 21; Rainey's Exhibit #68; Debtor's Exhibits #63].

42.   Rainey repeatedly asked the Debtor for an accounting of expenses so that a specific calculation of the amount owed to Rainey under the Agreement could be done.  The Debtor never provided him with any accounting. [Transcript D2, p. 210, line 13 through p. 212, line 18; p. 242, line 18 through p. 243, line 13].

43.   On March 26, 1998, Rainey sent a letter to Williams stating the following:

> As you are aware, through my employment with The Law Office of Valorie Davenport, I received an interest in the outcome of the Brio Litigation.  To date I am still due and owing in excess of $375,000.00 of Brio funds.  I have tried to meet with Valorie to resolve our differences but all attempts have failed.  Therefore, I hereby assert my interest in the Brio funds maintained by your office on behalf of the Law Offices of Valorie Davenport.  I request that you retain $400,000.00 ($375,000.00 plus reasonable attorney fees in the amount of $25,000.00) of those funds and that they not be distributed without prior approval of both Valorie and myself.  If you do desire I will file an interpleader.  However, as it stands now, I am relying on our earlier correspondence wherein you agreed to protect my interest. [Rainey's Exhibit #59].

44. On April 27, 1998, Rainey filed suit against the Debtor in the District Court of Harris County, Texas. The style of the suit was cause no. 98-20066, 269th Judicial District, *Ron Rainey v. Valorie Davenport, Individually, and doing business as the Law Offices of Valorie W. Davenport* (the 1998 Lawsuit). The suit alleged that the Debtor breached the Agreement. Rainey requested that the Court award him damages. The Debtor filed an answer to Rainey's petition, and thereafter, Rainey attempted to conduct discovery. [Transcript D1, p. 85, line 23 through p. 90, line 2;  Debtor's Exhibit #22; Rainey's Exhibits #16, 17, 18, 19,  and 20].

45. On July 30, 1998, the Debtor received $469,619.28 from the Williams law firm. [Transcript D3, p. 235, lines 11 - 17; Rainey's Exhibit #15, p. 27 marked as V00027]. This payment was due to the Davenport Law Firm as part of its contingent fee related to the Williams/Brio Litigation.  The Debtor deposited this check into her firm's operating account and did not deposit the money into an IOLTA account.  Moreover, when she received this money, the Debtor neither notified Rainey of her receipt of these funds nor paid him any portion of these funds.  [Transcript D1, p. 81, line 11 through p. 84, line 22].

46. On February 10, 1999, Rainey's attorney in the 1998 Lawsuit wrote a letter to the Debtor's attorney in that suit.  The purpose of this letter was to educate the Debtor's attorney about Rainey's position—i.e. that the Debtor still owed him a portion of the fees generated by the Brio/DOP Litigation—in order to assist the Debtor's attorney in evaluating the Debtor's position.  With respect to the meaning of the phrase "less expenses directly related to the Brio/DOP Litigation," three paragraphs in this letter address the issue:

17

On August 14, 1996, Valorie writes Ron requesting his understanding of what terms should be incorporated into the contract between them.  The letter expressly asked Ron, "how do we define expenses?"

The next letter from Ron written September 20, 1996 Ron directly addressed the issue of expenses by stating, "Our agreement was outcome less case related expenses.  This did not include such items as salaries, rent, or any overhead.  It was case expenses as they relate to that specific case."

On November 26, 1996, Ron and Valorie both enter into a signed agreement regarding the Brio cases.  The agreement specifically addresses the expenses to be subtracted from the gross fees received.  Stated in the contract, Ron Rainey is to receive an amount equal to 15% of the fees generated in the Brio litigation <u>less expenses directly related</u> to the Brio/DOP litigation.  Given the extent of discussion surrounding expenses and the negotiations prior to the final contract, it is clear what <u>expenses directly related</u> means and why directly was included in the final version of the contract. [Rainey's Exhibit #71; Debtor's Exhibit #29].

47.   In the spring of 1999, the Debtor and Rainey began a mediation in an attempt to reach a settlement and avoid going to trial in the 1998 Lawsuit.  On April 19, 1999, the Debtor wrote a letter to the mediator (the Honorable Frank C. Price) setting forth her thoughts about the issues related to the suit brought by Rainey against her.

In this letter to the mediator, the Debtor expressed her thoughts as to why she owed nothing more to Rainey:

Brio clearly took up the great majority of VWD's law firm's time and available resources during the time it was worked jointly (or for certain periods of time independently) by her office.  If *Brio* is charged 50% of those overhead monies, RSR would owe her firm or, at best, if it were charged a far lower percentage, he would be entitled to receive nothing.  As it stands now, he has been paid handsomely, endured none of the pain in keeping the case alive, and did not lose any capital investment or be placed in a position where he is still pay [sp] off old firm debt because the firm went in the hole handling the case.  His credit was not destroyed because of the blow that this case dealt, not [sp] does he face future financial problems directly related to Brio.

18

As far as VWD is concerned, RSR has been grossly over-paid and his skills highly over-rated. Many others who worked directly with RSR are ready to attest to his lack of competence, commitment and effective contribution to the ultimate result (albeit less that [sic] all had hoped) in the Brio case. His lack of commitment to the clients can and will, if necessary, clearly be shown by what now has happened in Galveston. Finally, as far as any benefit or income (beyond Brio) that he supposedly brought to VWD's firm, the numbers speak for themselves. In the entire time he worked at the Law Offices of VWD, RSR's total, combined figure for *all four years* amount to less than **$25K** in fees.

It is VWD's position that RSR is not entitled to one more dime from her firm, via Brio or otherwise. I guess this makes the potential for an amicable settlement look pretty bleak, doesn't it? [Debtor's Exhibit #64].

48.    In May of 1999, mediation took place between the Debtor and Rainey, and their respective

counsel. On May 21, 1999, the Debtor sent Rainey a letter outlining terms of the settlement.

[Debtors's Exhibit #65.]

49.    On or about November 20, 1999, after further mediation, the Debtor and Rainey achieved

a settlement of the 1998 Lawsuit. They executed a document entitled "Mediation Settlement

Agreement" (the Mediation Settlement Agreement) whereby the Debtor was to pay Rainey

the sum of $300,000.00, with this amount to be paid as follows: (a) The Debtor was to

execute a promissory note for $150,000.00 bearing interest at 10% per annum and to be paid

in sixty consecutive monthly installments of $3,160.73, beginning on August 1, 2000; and

(b) $150,000.00 was to be paid if and when monies were ever generated from any of the

pending suits comprising the Davenport/Brio Litigation. [Transcript D1, page 194, line 3

through p. 195, line 5; Rainey's Exhibit #22; Debtor's Exhibit #23].

50.    On November 20, 1999, pursuant to the Mediation Settlement Agreement, the Debtor

executed a promissory note in the amount of $150,000.00 to be repaid in 60 monthly

installments of $3,160.72, beginning on August 1, 2000, and on the first day of each month thereafter until paid in full. [Transcript D1, p. 196, line 19 through p. 197, line 6; Rainey's Exhibit #23].

51.     Except for the *de minimus* amount of $2,000.00, Rainey has not received any payment from the Davenport/Brio Litigation; and given the unsuccessful results of the litigation since the execution of the Mediation Settlement Agreement, neither the Debtor nor Rainey ever expects that Rainey will receive any monies in the future from this particular litigation. [Transcript D1, p. 195, line 10 through p. 196, line 12].[4]

52.     At mediation, the Debtor attempted to convince Rainey to resume representing the plaintiffs in the Davenport/Brio Litigation. Rainey refused. At trial, the Debtor admitted that all terms of the mediated settlement were set forth in the Mediation Settlement Agreement and that Rainey had no obligation to work on the Davenport /Brio Litigation. [Transcript D1, p. 198, line 3 through p. 199, line 7; Rainey's Exhibit #22].

53.     On August 1, 2000, the date that the first installment was due to be paid under the $150,000.00 promissory note, the Debtor failed to make the payment. [Transcript D1, p. 199, lines 8 - 12].

54.     Pursuant to the terms of the Mediation Settlement Agreement, because the Debtor defaulted under the promissory note, Rainey filed an amended petition in the 1998 Lawsuit requesting

---

[4]The Debtor and Rainey have both arrived at this conclusion because one month before the trial of this adversary proceeding, The Honorable John R. Froeschner, the United States Magistrate Judge to whom the Davenport/Brio Litigation was referred by the United States District Court for the Southern District of Texas, Galveston Division, issued a 23-page Report and Recommendation recommending, among other recommendations, that the suit be dismissed. [Debtor's Exhibit #41].

the Harris County District Court to enforce the terms of the Mediation Settlement Agreement. Rainey filed this amended petition on August 9, 2000. [Transcript D1, p. 199, lines 13 - 15; Rainey's Exhibit #24].

55.   After Rainey filed the amended petition, the Debtor began making payments under the promissory note. Because the Debtor began performing under the note, Rainey non-suited the 1998 Lawsuit on September 22, 2000. [Transcript D1, p. 199, lines 16 - 19; Rainey's Exhibit #25; Debtor's Exhibit #24].   The Debtor made thirteen consecutive monthly payments, representing the payments due on August 1, 2000, up to and including August 1, 2001, but she failed to make the payment due on September 1, 2001.[5] [Transcript D1, p. 199, line 20 through line p. 200, line 7].

56.   On September 13, 2001, Rainey's attorney, Russell Briggs, sent a telefax letter to the Debtor setting forth that the payment due to Rainey on September 1, 2001, was not made and that Rainey would take action against her if payment was not made by the close of business on September 19, 2001.   Later that same day, the Debtor sent a telefax letter to Mr. Briggs acknowledging that she was in default and setting forth that her law firm was waiting to receive expected fees and that she hoped to have those fees paid soon so that she could pay

---

[5] At trial, the Debtor spent a portion of her time cross-examining Rainey about a chart attached as the last page of Rainey's Exhibit 28 (This chart is also Debtor's Exhibit #40). This chart sets forth a history of the thirteen payments that the Debtor made to Rainey. Although it is undisputed that the Debtor made these payments during the 13-month period between August 1, 2000, and August 1, 2001, the chart mistakenly showed that she made the payments between August 1, 2001, and August 1, 2002. The Debtor seemed to believe that her defense would be strengthened through prolonged cross-examination of Rainey over this error. When this Court asked the Debtor whether she was seriously going to take the stand and testify under oath that she made the payments between August 1, 2001, and August 1, 2002, she immediately stated that she was not. [Transcript D2, p. 222, line 3 through p. 232, line 7]. All in all, not only did the Debtor's cross-examination do nothing to help her defense, but it hurt her credibility.

Rainey.  [Debtor's Exhibit #12].

57.     On September 20, 2001, Rainey's attorney responded to the Debtor's letter of September 13,

        2001, by sending the Debtor a letter setting forth that: (a) the Debtor had failed to make the

        payment due on September 1, 2001;  (b) Rainey was willing to give her until October 5,

        2001, to cure this default; and (c) if this payment, as well as the regularly scheduled payment

        due on October 1, 2001, were not both paid by October 5, 2001, then Rainey would file suit

        for breach of the Mediation Settlement Agreement.  [Debtor's Exhibit #67; Transcript D2,

        p. 218, line 22 through p. 222, line 2].

58.     The Debtor failed to cure the default under the promissory note.  On October 29, 2001,

        Rainey filed a second suit against the Debtor in the District Court of Harris County, Texas.

        The style of this suit was cause number 2001-55529, 129th Judicial District, *Ron Rainey v.*

        *Valorie Davenport Legal Group* (the 2001 Lawsuit).[6]  This suit alleged that the Debtor had

        breached the Mediation Settlement Agreement and the $150,000.00 promissory note, and

        Rainey requested judgment for the following amount: (a) the balance of the $150,000.00

        note; (b) attorney's fees provided for under the note; and (c) the $150,000.00  from the

        Davenport/Brio Litigation if fees were ever paid in that litigation.  [Transcript D1, p. 200,

        lines 8 - 17;  Debtor's Exhibit #3; Rainey's Exhibit #26].

59.     On February 11, 2002, the Debtor, representing herself *pro se*, filed a general denial in the

        2001 Lawsuit.  [Transcript D1, p. 200, lines 16 - 17; Debtor's Exhibit #4; Rainey's Exhibit

_____

        [6]Although the Original Petition was filed in the 129th Judicial District, the suit was subsequently transferred to
the 269th Judicial District.

#27].

60.     On April 5, 2002, Rainey filed a Motion for Summary Judgment in the 2001 Lawsuit.
        [Debtor's Exhibit #5; Rainey's Exhibit #28].  Additionally, on April 5, 2002, Rainey filed
        a Notice of Submission setting forth that his Motion for Summary Judgment was set on the
        Court's submission docket for April 29, 2002.  [Rainey's Exhibit #29].

61.     On April 23, 2002, the Harris County District Court signed a Docket Control Order in the
        2001 Lawsuit.  [Debtor's Exhibit #6].  This order set forth that trial would be held on
        December 9, 2002.

62.     On April 29, 2002, the Debtor filed two pleadings:  (a) Defendant's Motion for Continuance
        on Submission and Filing Response to Plaintiff's Motion for Summary Judgment; and (b)
        Defendant's Motion for Leave to File Late Response to Plaintiff's Motion for Summary
        Judgment.  [Rainey's Exhibits #30 and 31].

63.     On April 30, 2002, the Debtor filed her Initial Response to Rainey's Motion for Summary
        Judgment in the 2001 Lawsuit.  [Debtor's Exhibit #7; Rainey's Exhibit #32].

64.     On May 8, 2002, Rainey filed a Notice of Hearing setting forth that on May 17, 2002, at 1:00
        p.m., a hearing would be held on his Motion for Summary Judgment.  [Rainey's Exhibit
        #33].  However, no such hearing was held.

65.     On May 10, 2002, the Debtor filed her First Amended Original Answer in the 2001 Lawsuit.
        [Debtor's Exhibit #8; Rainey's Exhibit #34].

66.     On October 25, 2002, Rainey filed a Notice of Submission setting forth that his Motion for
        Summary Judgment would be presented to the Court for ruling without the necessity of a

hearing unless the Debtor requested one.  [Rainey's Exhibit #35].

67.     On November 11, 2002, the Debtor filed a Motion for Continuance on Rainey's Motion for Summary Judgment in the 2001 Lawsuit.  The basis for this motion was that the Debtor was still conducting discovery.  Included in this Motion for Continuance was what the Debtor labeled a "Preliminary Response to Motion for Summary Judgment." [Debtor's Exhibit #11; Rainey's Exhibit #36].

68.     On December 2, 2002, the Debtor filed another Motion for Continuance, together with a Plea in Abatement, in the 2001 Lawsuit.  The basis of this Motion was that the Debtor was about to undergo shoulder surgery.  [Debtor's Exhibit #14; Rainey's Exhibit #37].

69.     On December 4, 2002, in the 2001 Lawsuit, Rainey filed a Response to the Debtor's Motion for Continuance or in the Alternative Plea in Abatement.  [Debtor's Exhibit 15].  Rainey opposed the Debtor's Motion.

70.     On December 4, 2002, in the 2001 Lawsuit, the Court granted the Debtor's Motion for Continuance but expressly set forth on the docket sheet that no further continuances would be granted absent a showing of good cause.  [Debtor's Exhibit #2; Rainey's Exhibit #39].[7]

71.     On February 18, 2003, Rainey's attorney in the 2001 Lawsuit telefaxed to the Debtor a Notice of Hearing setting forth that the hearing on Rainey's Motion for Summary Judgment would be held on March 7, 2003, at 11:00 a.m.  [Debtor's Exhibit #17; Rainey's Exhibit #38].

---

[7]At trial, the Debtor incorrectly testified that this Motion was denied.  [Transcript D3, p. 201, lines 2 - 6].

24

72. On March 6, 2003, the Debtor filed a Motion for Continuance in the 2001 Lawsuit requesting that the hearing scheduled for March 7, 2003 be continued. [Debtor's Exhibit #18; Rainey's Exhibit #40].

73. On March 7, 2003, in the 2001 Lawsuit the Court denied the Debtor's Motion for Continuance. The Debtor failed to appear at the hearing.  The Court then granted Plaintiff's Motion for Summary Judgment (the Judgment) and awarded judgment for Rainey against the Debtor in the following amounts:  (a) the principal sum of $120,359.13; (b) accrued interest on such principal sum at the rate of 18% per annum from August 6, 2001, through the date of judgment in the amount of $16,248.48; (c) post judgment  interest against Debtor at the rate of 18% per annum; (d) attorney's fees in the amount of $34,151.90, together with interest after judgment on same against Debtor at the rate of 18% per annum; and (c) $150,000.00 of the "Funds" received (actually or constructively) by Debtor or Debtor's law offices from the following cases:

> (i) Cause No. G-96-494; *Le, et al., v. Monsanto, et al.*, in the United States District Court, Southern District of Texas, Galveston Division.

> (ii) Cause No. G-96-498; *Rivas, et al., v. Monsanto, et al.*, in the United States District Court, Southern District of Texas, Galveston Division.

> (iii) Cause No. 96-62960; *Kim Ngoc Ivey v. Medical Engineering Corp., et al.*, in the District Court of Harris County Texas, 334th Judicial District.

The Judgment defines "Funds" to mean the total monies received (actually or constructively) by Debtor or Debtor's law offices, less client expenses directly related to the respective cases

25

and less proceeds paid to clients as damages or compensation. If "Funds" exceed $150,000.00, the Judgment awards the excess to be applied to the promissory note made by the Debtor in favor of Rainey.

The Judgment further awards Rainey: (a) attorney's fees and costs in the amount of $15,000.00 if Debtor should appeal the Judgment to the Court of Appeals; (b) attorney's fees and costs in the amount of $5,000.00 if Debtor should appeal the Judgment to the Texas Supreme Court; and (c) costs of the suit, together with interest after judgment on the same at the maximum rate provided by statute. [Rainey's Exhibit #41; Debtor's Exhibit #19].

74.    On April 7, 2003, the Debtor filed a Motion for New Trial in the 2001 Lawsuit. [Debtor's Exhibit #20; Rainey's Exhibit #43].

75.    On May 9, 2003, the Harris County District Court held a hearing on the Debtor's Motion for New Trial, and on May 30, 2003, this Court denied the Debtor's Motion for New Trial. [Debtor's Exhibit #21; Rainey's Exhibit #44].

76.    On June 2, 2003, the Debtor filed a Chapter 11 petition. [Transcript D1, p. 19, line 22 through p. 20, line 3; Docket No. 1].

77.    On September 30, 2003, Rainey filed a proof of claim in this bankruptcy case. Rainey attached to this proof of claim a copy of the Judgment rendered in the 2001 Lawsuit. The amount of this claim is $321,807.35, which represents the actual amount awarded in the Judgment, plus interest that had accrued since the entry of the Judgment. [Rainey's Exhibit #60]. The Debtor has never filed an objection to this proof of claim.

78.    On October 7, 2003, the Debtor filed her Original Disclosure Statement. [Rainey's Exhibit

#52; Docket No. 56]. On page 11, Rainey's claim is described as "Allowed as filed."

79.     On April 30, 2004, the Debtor's Chapter 11 case was converted to a Chapter 7 case. [Transcript D1, p. 20, lines 4 - 8; Debtor's Exhibit #72; Docket No. 104].

80.     On August 9, 2004, Rainey filed in this Court his Complaint to Determine Dischargeability of Debt. [Rainey's Exhibit #50; Docket No. 165].

81.     On December 14, 2004, the Debtor filed her Original Answer, Counterclaim and Request for Jury Trial.[8] [Rainey' Exhibit #46].

82.     Trial of this adversary proceeding was held on April 12, 13, 14, 15, 21 and 22, 2005.

83.     The attorneys' fees incurred by Rainey for the prosecution of this adversary proceeding totaled $35,496.35 (for Michael Essmyer's services) and $1,968.75 (for William A. Short Jr.'s services), respectively, for an aggregate amount of fees of $37,465.10. The expenses incurred by Rainey totaled $3,838.00. Therefore, the total amount of attorney's fees and expenses incurred by Rainey is $41,303.10.[9] Further, if the Debtor appeals this Court's order relating to this adversary proceeding, Rainey's counsel estimated that additional attorney's fees will be as follows: (a) at least $2,500.00 for ten hours of work; (b) another $7,500.00 for any appeal to the Fifth Circuit; and (c) another $2,500.00 for any appeal to the U.S. Supreme Court and, if oral arguments are held, another $7,500.00. [Rainey's Exhibits #73, 73A and 73B; Transcript D2, p. 284, line 23 through p. 298, line 11].

---

[8]The Court denied the Debtor's Request for Jury Trial. The Court also dismissed the Debtor's counterclaims on the grounds that these claims belong to the Chapter 7 Trustee and, therefore, the Debtor has no standing to bring these counterclaims.

[9]The Court finds that these fees and expenses are reasonable.

### III. CREDIBILITY OF WITNESSES

Five witnesses testified during this six-day trial: (1) the Debtor; (2) Rainey; (3) Tina K. Salem, an expert witness retained by Rainey; (4) Denise W. Novotny, the Debtor's sister; and (5) Michael M. Essmyer, the attorney for Rainey (whose testimony solely concerned the attorney's fees incurred by Rainey). Set forth below are the Court's findings concerning the credibility of these witnesses.

A.      Ron S. Rainey (Rainey)

Rainey testified on the first and second day of trial. He was forthright and responded directly and promptly to questions, both on direct and cross-examination. This Court found Rainey to be a credible witness.

B.      Michael M. Essmyer (Essmyer)

Essmyer testified on the second day of trial for a few minutes on the sole issue of the attorney's fees and expenses incurred by Rainey. This Court found Essmyer to be a credible witness.

C.      Tina K. Salem (Salem)

Salem testified for approximately 4½ hours on the second day of the trial. She appeared as an expert witness for Rainey. Her testimony concerned, among other issues, whether the Debtor had a fiduciary duty to Rainey with respect to safeguarding the monies received from the Brio/DOP Litigation pending resolution of how much Rainey was to receive. Although the Court found Salem to be a very engaging and credible witness, the Court disagrees with her conclusion that the Debtor owed a fiduciary duty to Rainey. With respect to any other opinions that Salem gave—either during her court appearance or in her written report [Rainey's Exhibit #55]—to the extent that such

28

opinions are consistent with the findings of fact and conclusions of law made by this Court, such consistency is entirely coincidental. This Court's findings of fact and conclusions of law are made based not upon Salem's testimony or report, but rather upon this Court's evaluation of the testimony given by the Debtor, Rainey, Essmyer and the Debtor's sister, and this Court's own research of the legal issues involved in this dispute.

D.      Valorie W. Davenport (the Debtor)

The Debtor is a licensed attorney who has been practicing law for over twenty years. [FOF Nos. 1 and 2]. Because she is a well-educated person who is capable of understanding complex issues, it is logical to infer that she understands the difference between truth and lies. *See In re Graham*, 199 B.R. 157, 159-160 (Bankr. N.D. Ohio 1996); *see also In re W. World Funding, Inc.*, 52 B.R. 743, 753 (Bankr. D. Nev. 1985) (noting that the Court may determine whether a witness can discern the difference between truth and lies).

The Debtor testified extensively during trial. Rainey's attorney called her as an adverse witness, and she was in the witness box for approximately eight hours of the first day of trial. The Debtor, representing herself *pro se*, then called herself as a witness when she put on her case in chief, which began during the afternoon of the third day of the trial. She testified for approximately three hours on that day. She then continued her testimony for a portion of the morning on the fourth day. Finally, on the sixth and last day of trial, over the objection of Rainey's counsel, this Court allowed the Debtor to re-take the stand and give further testimony. On this day, she testified for approximately one and one-half hours. All in all, the Debtor testified for over thirteen hours. This Court therefore had ample opportunity to observe the Debtor and listen to the answers she gave as

both an adverse witness and as a witness examining herself on direct examination.

In addition to observing and listening to the Debtor at trial, this Court has read, and re-read, the trial transcript and the extensive notes that the Court made at trial. Reviewing the transcript and notes confirmed the initial reactions that this Court had during the course of the trial. These initial reactions, plus post-trial reflections, have led this Court to conclude that the Debtor is not credible.

The Court has arrived at this conclusion for several reasons. First, the Debtor's testimony at trial about her position on one of the key issues in this suit—Under the Agreement, when was Rainey to be paid his percentage interest in the fees generated by the Brio/DOP Litigation?—directly contradicted her actions and words in 1996, 1997, 1998 and 1999. At trial, the Debtor incessantly insisted that under the Agreement, Rainey was not entitled to receive a dime until all the Brio/DOP Litigation—which included not only the O'Quinn/Brio Litigation and the Williams/Brio Litigation, but also the Davenport/Brio Litigation—was completely over. According to the Debtor, under the Agreement, Rainey was not entitled to any money until all of this litigation was concluded because his fee could not be determined until every expense from the Brio/DOP Litigation could be calculated. According to the Debtor, if the total fees exceeded the total expenses, Rainey would receive 15% of the surplus; but if the total expenses exceeded the total fees, then Rainey would receive nothing. [Transcript D, p. 83, line 3 through p. 84, line 5; Transcript D1, p. 165, lines 18 - 21; Transcript D1, p. 166, line 25 through p. 167, line 9; Transcript D1, p. 168, lines 1 - 25].

At trial, the Debtor pointed to the following highlighted language in the Agreement to support what she claimed was her longstanding position that Rainey was not entitled to any payment until every piece of the Brio/DOP Litigation was concluded:

30

This document shall hereby memorialize a prior assignment to Ron Rainey, as a condition of Ron Rainey accepting employment with the Law Offices of Valorie W. Davenport in October of 1993, of an amount equal to 15% (fifteen percent), less expenses directly related to the Brio/DOP litigation, of the interest of The Law Offices of Valorie W. Davenport in the outcome of any and all Brio/DOP litigation of which the law office of Valorie W. Davenport had an interest in as of October 3, 1993 and/or acquired an interest in prior to the date below. Ron Rainey is also hereby assigned the same percentage interest in any and all Brio/DOP litigation of which The Law Offices of Valorie W. Davenport may acquire subsequent to the date below as long as Ron Rainey works on and is associated with this subsequently acquired litigation. This assignment includes the Aguilar, Le and Melendez lawsuits previously settled, but does not include any prior ad litem disputes with the 151st court. (emphasis added).

This Court does not believe that this  highlighted language supports the interpretation that the Debtor articulated at trial.[10]  Assuming, however, that her interpretation of this language is reasonable, the Debtor never once expressed this view to Rainey in 1996, 1997, 1998, or 1999. These four years are important because 1996 was the year that the Debtor and Rainey negotiated the language in, and then executed, the Agreement; 1997 was the year that the Williams/Brio Litigation settled—thereby generating the highest fees of all the Brio/DOP Litigation—with the Debtor actually distributing some monies to Rainey; 1998 was the year that Rainey attempted to negotiate a settlement with the Debtor and, when he was unsuccessful in doing so, filed suit against her; and 1999 was the year that the Debtor and Rainey participated in mediation to resolve their dispute. Both the Debtor's words and actions in these years strongly indicate that the Debtor never interpreted the

---

[10]Based upon the testimony that this Court heard at trial, plus this Court's review of various exhibits, and its own reading of the Agreement in whole and the highlighted language in particular,  this Court finds that the most reasonable interpretation is this:  for each discrete suit of the Brio/BOP Litigation that generated net fees to the Davenport Law Firm, Rainey was to receive 15% of those fees upon delivery of the funds to the firm.

Agreement in the manner about which she testified at trial.[11]

In 1996, after the Debtor wrote Rainey a letter requesting him to set forth his understanding of the terms of his employment, [FOF No. 18], she did not tell him that regardless of those terms, no money would be paid to him unless aggregate fees exceeded aggregate expenses after the entire Brio/DOP Litigation was complete.  In fact, after her firm received the fee from the O'Quinn/Brio Litigation in November of 1996,  the Debtor, spent some of those funds to pay for her own personal expenses and overhead at her firm—acts which indicate that she herself did not believe there was a need to wait until all litigation was over.  [FOF No. 36].[12]  As important, the $162,514.03 check which O'Quinn delivered to the Debtor's firm was actually a small percentage (13.9%) of the entire fee earned by the Debtor's firm because O'Quinn had deducted several hundred thousand dollars for monies owed to him on a loan he[13] had extended to the Debtor to purchase her home on Sunset Boulevard .  [FOF No. 15].   These facts underscore more specifically the direct contradiction between the Debtor's words and actions: the Debtor personally was not waiting until all the Brio/DOP Litigation was concluded before she took her share of the fees generated from those suits

---

[11]Even if she really did have this interpretation, the Debtor is equitably estopped from now adopting this interpretation.  "One who by his conduct has induced another to act in a particular manner should not be permitted to adopt an inconsistent position and thereby cause loss or injury to the other." *Maguire Oil Co v. City of Houston*, 69 S.W. 3d 350, 367 (Tex. App. - Texarkana 2002, pet. denied); *Fabrique, Inc. v. Corman*, 796 S.W. 2d 790, 792 (Tex. App. - Dallas 1990, writ denied).  The Debtor induced Rainey to join her firm by promising him a percentage of the fees, and in fact paid him some of these fees in 1997.  The Debtor is now causing Rainey to suffer loss or injury by adopting the inconsistent position that she does not owe him a dime until all of the Brio/DOP Litigation is completed.

[12]It is no small fact that the Debtor spent these funds because, by this time, Rainey had responded to the Debtor's request to set forth his recollection of the terms of his employment [FOF No. 19], and his letter was quite clear that expenses did not include salaries, or any firm overhead.

[13]Or his law firm; the record is not clear.

that had been resolved.

The same can be said for the Debtor in 1997, which was _after_ the Agreement was executed. The Debtor continued to spend Brio/DOP Litigation fees to pay for her personal bills and for her firm's overhead and rent. [FOF No. 38]. These actions reveal, once again, that the Debtor herself was not waiting until the end of all the Brio/DOP Litigation to distribute fees. Moreover, her testimony at trial that Rainey was supposed to wait until the end is an interpretation as inequitable as it is tortured: attorneys who are in a fee-sharing arrangement expect to receive their distributions simultaneously. This fact is particularly telling because by this time, the Debtor was well aware of Rainey's disenchantment about not having received any payment from the fees that had been collected from those suits that had already settled.

If, as in 1996, the Debtor had not paid anything to Rainey in 1997, then her trial testimony that he needed to wait until the end of the entire Brio/DOP Litigation would have at least some measure of consistency—even if her own unwillingness to wait until all suits were resolved undermines her position.   But in 1997, the Debtor paid Rainey three payments totaling $400,000.00.[14] Two of these payments—each for $50,000.00—came in the wake of the Debtor's firm receiving $500,000.00 from the Williams/Brio Litigation; and the third payment for $300,000.00 came after the Davenport Law Firm received another $2,245,447.39 from the Williams/Brio Litigation. [FOF Nos. 25, 26, 27, 28 and 29]. Moreover, all three payments to Rainey were made several days after he had informed the Debtor that he would be leaving her firm, and the

---

[14]Actually, the Debtor paid Rainey $300,000.00 and $50,000.00 herself and authorized Williams to directly pay Rainey an additional $50,000.00. [D1, p. 55 line 29 through p. 56 line 1; D1, p. 59, line 7 through p. 60, line 18].

last two payments actually were paid several days after Rainey had departed from the firm.  At this time, the suits comprising the Davenport/Brio Litigation were still  far from being over; indeed, the Davenport/Brio Litigation was not over until March of 2005.  [FOF No. 51].  If, as the Debtor testified at trial, Rainey was not entitled to any payments until every last one of the suits comprising the Brio/DOP Litigation was over, then why did the Debtor pay Rainey $400,000.00 after the Davenport Law Firm received more than $2.7 million in fees from the resolution of only the Williams/Brio Litigation—a figure, it should be noted, equal to approximately 15%, as set forth in the Agreement?

The only reasonable explanation is this: the Debtor believed the terms of the Agreement were that Rainey was to receive 15% of fees whenever the fees from any discrete suit were paid to the Davenport Law Firm so long as the expenses relating to the resolved suit or suits had been deducted (which was the case in the Williams/Brio Litigation).  This interpretation is not only plausible because of the payments which the Debtor made to Rainey in September of 1997, but also because during this time period, the Debtor herself was taking and spending her share of the fees that had been paid to her law firm from the O'Quinn/Brio Litigation and Williams/Brio Litigation.

At trial, the Debtor testified that the three payments to Rainey were "advances." [Transcript D1, p. 84, lines 2 - 5; Transcript D1, p. 68, lines 13 - 17; Transcript D3, p. 179, lines 7 - 15; Transcript D4, p. 60, lines 3 - 6].  She did so in an effort to justify her making these payments to Rainey while simultaneously  holding to her position that the Agreement required him to wait until all of the Brio/DOP Litigation was complete before he was to be paid any amount.  This testimony is not believable for three reasons.  First,  the Agreement itself contains no provision addressing

34

Rainey's right to an advance. Second, when the Debtor paid Rainey the $400,000.00 in September of 1997, she never indicated they were "advances". Third, the inference that must be drawn from the Debtor's testimony is that Rainey would have had to repay the $400,000.00 "advance"[15] if, at the end of all of the Brio/DOP Litigation, total expenses exceeded total fees such that Rainey was entitled to receive nothing—or at least something less than $400,000.00. Yet, the Debtor never discussed with Rainey repayment terms, such as what the interest rate would be or when the loan would have to be repaid. Moreover, at the time the Debtor made these payments to Rainey, she knew he was soon to depart from her firm or he had already left—much to her dismay if her testimony at trial is to be believed. She also knew that her firm was experiencing significant cash flow problems. [FOF Nos. 40 and 47]. Under these circumstances, it is too much for this Court to believe that the Debtor would loan Rainey the sum of $400,000.00. The Court believes that the far more likely reason the Debtor paid Rainey is that she believed the Agreement required her to do so and, having failed to pay Rainey anything from the O'Quinn/Brio Litigation, she was worried that Rainey would sue her if she did not pay him his share of the Williams/Brio Litigation fee.

This Court also finds the Debtor's testimony about "advances" to be terribly disingenuous given her trial testimony about Rainey. Throughout the trial, and in certain portions of her correspondence introduced as exhibits, the Debtor complained of Rainey's poor lawyering skills. For example, she testified that Rainey "was letting everybody else step all over him. . . ." [Transcript

---

[15] The word "advance" connotes the extension of credit which is to be repaid with interest. See, e.g., *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 415-416 (5th Cir. 2003); *Elliott v. United States*, 332 F.3d 753, 764 (4th Cir. 2003) ("The Court has concluded that, under §1014, a false statement need not be material to a financial institution's decision to <u>advance or loan funds</u>.") (emphasis added).

D3, p. 150, lines 3 - 4]; and she told the mediator in April of 1999 that "[o]nce the deal was in place and Ron Rainey came over, he was completely ineffective in moving VWD's [i.e. the Debtor's] existing cases; working up and finalizing appeals; or, even in handling routine administrative matters which were to be directly placed under his supervision and control." [Debtor's Exhibit #64]. If the Debtor believed that Rainey was as miserable an attorney as she testified and as her letter to the mediator described, would she really have advanced him $400,000.00 in September of 1997 expecting this advance to be paid back if, at the end of all the Brio/DOP Litigation, the aggregate expenses exceeded the aggregate fees, or where the aggregate fees exceeded the aggregate expenses by some amount less than $400,000.00? Indeed, at the time the Debtor paid him the $400,000.00, she knew that he was about to start his own law firm. [Transcript D1, p. 177, line 3; Transcript D1, p. 235, line 17 through p. 237, line 1; Transcript D1, p. 271, line 21 through p. 272, line 16]. If he was such a poor lawyer and wretched administrator, she could not have reasonably believed that he would succeed on his own and therefore generate sufficient income to repay the $400,000.00 advance should the total expenses exceed the total fees at the conclusion of all the Brio/DOP Litigation.[16] No reasonable person would have extended such an advance, particularly when that

---

[16]Despite the Debtor's barrage of criticism against Rainey, when Rainey's counsel asked her why she signed the Agreement, she testified that Rainey "pressured me to sign it." [Transcript D1 p. 158, lines 4 - 7, Transcript D1, p. 38, lines 8 - 13; Transcript D1, p. 39, line 25 through p. 40, line 16; Transcript D1, p. 42, lines 18 - 21; Transcript D1, p. 146, line 8 through p. 147, line 15; Transcript, p. 158, lines 1 - 7; Transcript D1, p. 164, line 25 through p. 165, line 8; Transcript D3, p. 12, lines 9 - 12; Transcript D3, p. 191, lines 18 - 25; Transcript D3, p. 192, line 21 through p. 193, line 13]. So, when it served the Debtor's interest–here, to provide testimony to support her affirmative defense that she signed the Agreement under duress–Rainey was such an overwhelming personality that he was able to pressure the Debtor, a seasoned 20-year trial lawyer who ran her own law firm, into signing the Agreement. On the other hand, when it served her interest to portray Rainey as someone who "was letting everybody else step all over him"–with the goal of showing him to be so weak and incompetent that he did not deserve the 15% fee under the Agreement–she did so without hesitation. This Court can only conclude that the Debtor speaks out of both sides of her mouth. Her credibility with this Court is nil.

36